**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1760-19

ALAN O'CONNELL and
LINDA O'CONNELL, his wife,

    Plaintiffs-Respondents,

v.

MR. JOHN,

    Defendant,

and

NETWORK CONSTRUCTION
COMPANY, INC.,

    Defendant-Appellant.

_____

Argued May 26, 2021 – Decided June 25, 2021

Before Judges Whipple, Rose and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Camden County, Docket No. L-1222-17.

Michael J. Marone argued the cause for appellant (McElroy, Deutsch, Mulvaney & Carpenter, LLP,

attorneys; Michael J. Marone and Richard J. Williams,
Jr., of counsel and on the briefs).

Michael A. Galpern argued the cause for respondents
(Javerbaum Wurgaft Hicks Khan Wikstrom & Sinins,
PC, attorneys; Eric G. Kahn, of counsel and on the
brief; Annabelle Steinhacker, on the brief).

PER CURIAM

Defendant Network Construction Company, Inc. appeals the Law Division's December 6, 2019 order entering judgment and awarding plaintiffs, Alan O'Connell and Linda O'Connell, $2,522,881.53, inclusive of pre-judgment interest, in this construction accident case tried before a jury. Defendant also appeals the denial of its motion for a new trial. We affirm.

I.

We discern the following facts and procedural history from the record on appeal. On April 1, 2015, plaintiff Alan O'Connell[1] worked as a tile finisher for a subcontractor, Baumgardner Floor Coverings (BFC), on a construction project in Galloway Township, managed by defendant, the general contractor. As of that date, plaintiff had already been working for three or four days in a building

---

[1] We refer to Alan O'Connell as "plaintiff" in this opinion unless otherwise noted.

at the jobsite and had been using temporary portable toilets[2] located near an exit in the middle of the building.

However, on April 1, those toilets were blocked off due to newly poured concrete, leaving only one available portable toilet located outside, several hundred yards away against the building's exterior, and inside a narrow planting bed. Plaintiff testified that there was an eighteen-inch space between the door of the portable toilet and the curb framing the edge of the planting bed. No one had measured the height or width of the curb. On the opposite side of the curb was a parking lot where there was a small wooden step or ramp that workers with wheelbarrows would lift up and use to dispose of debris in an adjacent dumpster. When the door of the portable toilet was fully opened, it could hit the dumpster.

That day, plaintiff had no difficulty stepping from the parking lot over the curb to enter the portable toilet. He had enough room to open the door without having to step into the planting bed. Upon exiting, plaintiff opened the door, stepped out, and was simultaneously looking for a front-end loader that he previously observed in the parking lot before entering the portable toilet. At

---

[2] In this opinion, we refer to portable toilet as "porta john," "porta-potty," "port-o-potty," and "toilet" interchangeably.

A-1760-19

that moment, the heel of his boot struck the curb, causing him to trip, fall, and twist his right knee.

Dr. Matthew Pepe, an orthopedic surgeon, diagnosed plaintiff as suffering from complex tears of the medial and lateral menisci and a neuroma of the right knee. After undergoing knee injections and five surgeries, Dr. Pepe opined that plaintiff would never work again as a tile finisher; would always have pain and limited function; and eventually would require knee replacement surgery.

On March 21, 2017, plaintiffs filed a negligence complaint against defendant and co-defendant Mr. John, seeking damages resulting from plaintiff's accident at the construction site. Plaintiff's wife also asserted a claim for loss of consortium. Defendant and Mr. John filed answers to the complaint. Prior to trial, plaintiffs' claims against Mr. John were settled and dismissed.

The case was tried over eight days from October 21 to November 1, 2019. The parties stipulated that plaintiff's past medical expenses totaled $101,980.79. Plaintiff's wife testified he is in pain on a daily basis and that his injuries substantially worsened his life and their lives together. Plaintiffs' liability expert, Dr. Stephen A. Estrin, was qualified as an expert in Occupational Safety

4

and Health Administration (OSHA) and construction safety.[3]  Estrin opined that as the general contractor, defendant was solely responsible for plaintiff's accident and injuries under three theories:  (1) failing to meet federal OSHA requirements; (2) failing to meet the obligations of defendant's prime construction contract; and (3) failing to meet the obligations of the industry's standard practice to maintain a jobsite free of obvious tripping hazards that could cause injury.[4]

Specifically, Estrin first testified that the OSHA construction regulations found in 29 C.F.R. § 1926 placed sole responsibility on the general contractor for the safety of all workers at a jobsite.[5]  That is, defendant, as a general

---

[3]  In April 2019, defendant moved to bar Estrin's testimony and report.  On October 21, 2019, the trial court denied defendant's motion but permitted defendant to renew its motion at the time of trial.

[4]  During oral argument, counsel for the parties could not confirm whether defendant was cited for any OSHA violations or if an OSHA hearing was conducted.

[5]  We note that OSHA's general safety and health provisions for construction and general industry, 29 C.F.R. § 1926.20, were amended in February 2020 following this trial.  The summary of the amendments states:  "These revisions do not affect the substantive requirements or coverage of the standards, do not modify or revoke existing rights or obligations, and do not establish new rights or obligations."  OSHA Standards and Regulations; Corrections, 85 Fed. Reg. 8726 (Feb. 18, 2020) (Summary).

A-1760-19

contractor controlled by a prime construction contract, was ultimately responsible under OSHA standards for the safety of all workers who came onto the construction site.

Estrin next testified about defendant's prime construction contract.[6] An enlarged copy was shown to the jury. It read in part:

> § 3.3 SUPERVISION AND CONSTRUCTION PROCEDURES
>
> § 3.3.1 The [c]ontractor shall supervise and direct the [w]ork, using the [c]ontractor's best skill and attention. The [c]ontractor shall be solely responsible for, and have control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the [w]ork under the [c]ontract, unless the [c]ontract [d]ocuments give other specific instructions concerning these matters.

Estrin stated that those general contract conditions came from the industry-wide standard legal forms prepared by the American Institute of Architects (AIA) for construction projects and conferred sole liability on defendant for jobsite worker safety. He explained:

> [T]he general conditions of the contract in this case are [taken from] an AIA, . . . general conditions to the prime contract. It's the AIA 201-20[0]7. They have within it a lot of stuff, but the two parts of it that are

---

[6] Plaintiff describes the contract as defendant's "contract with [p]laintiff's employer." However, Estrin was speaking about the prime construction contract "between Barrett, the owner of the property" and defendant.

extremely important are Article 3 Contractor, specifically . . . section 3.3.1, which states, in sum and substance, that the contractor shall apply his best skill and ability to the work and that he is solely responsible for construction means and methods, techniques, procedures, sequencing, and coordination of the work.

Now, construction means and methods in and of themselves, by definition, include job site safety. However, because the writers of that general conditions [sic], which go all the way back to 1992, have a specific section which deals with personal safety and property. And that's Article 10. Article 10.2 deals specifically with workers.

. . . .

That's the safety article of the general conditions. It deals with personal and property protection.

Estrin further stated that Section 3.3.1 of the AIA's standard form conditions and of defendant's signed contract made the general contractor "one hundred percent responsible. No matter what you subcontract out, whatever you do, you are solely responsible, one hundred percent, for your direct employees and your subcontractors . . . ." Under Section 3.3, the general contractor also was solely responsible for "housekeeping," which meant "[h]ow you set equipment up on the job, how you set temporary toilets up on the job, all of that is housekeeping." Thus, in addition to OSHA regulations making defendant

7

responsible for everyone on the jobsite, defendant had signed a "contractual promise to be solely responsible for the safety and the housekeeping."

Next, Estrin testified that defendant was liable for all of plaintiff's injuries because it failed to meet the obligations of the industry's standard practice to maintain a jobsite free of obvious tripping hazards that could cause injury. Specifically, defendant had failed to exercise reasonable care in the portable toilet's positioning, which created an obvious tripping hazard. In addition, Estrin attributed responsibility to defendant's representative, the construction site supervisor, superintendent, John L. Carman, and pointed to defendant's safety manual.

First, according to the interrogatories submitted by defendant's president, Carman was the person responsible for directing placement of the portable toilet on the jobsite. Plaintiff's counsel then read Carman's deposition testimony to the jury:

> Q. Did you ever receive any OSHA training?
>
> A. No.
>
> Q. Before this accident ever happened either on this job site or at any other job site, you had [sic] ever seen a portable toilet near a curb?
>
> A. Specifically no, but I've seen them a lot of different places.

8

Q. But you have to move them and put them in an area on the job site that [is] not only convenient, but [is] as safe as possible. Is that correct?

A. That's correct.

Q. And, sir, if you look at the location of the portable toilet there, is there any reason why that door has to open out facing the curb?

A. No. It could have been spun the other way.

Q. However, nothing would prevent that . . . portable toilet . . . [f]rom being spun [ninety] degrees, though, would it?

A. Not that I'm aware of.

Q. And if it was spun [ninety] degrees, someone could walk out and take multiple steps on a flat surface; right?

A. Yes.

Q. Sir, I think we already went over it, but can we agree that someone shouldn't step out of a portable toilet and onto a curb; right?

A. Yes.

Q. And we already said that [defendant] was responsible for the overall safety of the job site; right?

A. That's true.

Q. Do you agree with me that locating a place for portable toilets should not create any unsafe or tripping hazards to exposed workers?

9

A-1760-19

A. I agree.

Q. And we agree that someone should not be hurt stepping out of a portable toilet and onto a curb; correct?

A. Yes.

Based on this deposition testimony, Estrin concluded that Carman was not a "competent person" and that defendant did not have any competent person supervising the jobsite. According to Estrin, a "competent person" would have noticed there were tripping hazards near the portable toilet and corrected them. He elaborated:

> [A] competent person, by definition under OSHA, at [29 C.F.R. §] 1926.32(f) states that it is an individual who is capable of determining existing and predictable hazards in the workplace and has the authority to take immediate correction when those hazards are identified.
>
> So now we start with you're going to put a porta john in a location. That's a predictable hazard if that location has a curb in front of the porta john access and egress. That's predictable. So you don't put it there to begin with. If, for some reason, you decide to put it there, you make a mistake, well now it's an existing hazard.
>
> This unit was in place approximately four weeks prior to [plaintiff]'s accident. They -- and a competent person is required under 1926.20(b)(2) to make regular and frequent inspections of the job site, which Mr.

10

Carman testified that he did. Therefore, he had to check this site out not only for a porta john, but for the dumpster.

Now, Mr. Carman . . . has . . . no training to identify these kind of hazards under OSHA, because he was never trained by his employer. Therefore, if he had been competent, he would have picked it up before it was placed and definitely after it was placed, and well before [plaintiff] was subjected to the unsafe condition of the porta john or the temporary toilet behind a curb.

In fact, based on his own OSHA and construction knowledge and experience, Estrin asserted to make the site safer, defendant only had to "[t]urn the toilet [ninety] degrees so that the long flat dirt area was where the door opened up to get in[gress] or egress from. Then you could just walk down that way and then it just flares out from there and there's no problem."

Second, Estrin testified about defendant's safety manual. That document stated:

[T]he program contained in this manual shall be established through accomplished -- a series of bullet points.

The first is "To protect and promote the health and safety of employees by integrating safety into our daily operations."

Second, "To minimize employee injuries by providing safe and healthful work environments, preventing unsafe acts, and controlling exposures to health and safety hazards on all jobs."

11

A-1760-19

Third, "To assure all managers and employees have received orientation instruction and training in health and safety."

. . . .

Five, "To comply with pertinent regulatory obligations."

And six, "Assure the safety, health and environmental and loss control programs are given the proper priority and attention and are achieving the required results."

Applying those bullet points, Estrin opined that defendant had not met the policies espoused in its own safety manual because it had not: (1) complied with OSHA standards; (2) trained Carman; or (3) provided a safe and healthful environment for subcontractors and employees like plaintiff. Estrin explained that the second bullet point affected defendant's employees and all outside subcontractors and their employees on the sites defendant controlled as the general contractor. The fifth bullet point meant federal and/or state OSHA standards and regulations and other laws. Thus, Estrin concluded that:

> pursuant to the contract between Barrett, the owner of the property, and [defendant], and the OSHA regulations which established the fact that the general contractor [defendant] is 100 percent responsible for job site worker safety, the proximate cause of the accident is [defendant's] failure to have done what was necessary to ensure [plaintiff]'s safety; that he had a

12

[jobsite] free of a tripping hazard and going to a temporary toilet is part of the [jobsite] as important as any other part of the [jobsite], and it be free of a tripping hazard, and that was not done. That they had more than adequate time to have identified the tripping hazard and to have corrected it as they were required to do if in fact they had a competent person on the job in the form of their superintendent, Mr. Carman. He was not an OSHA qualified competent person, and therefore, was unable to do what he was required to do pursuant to the contract which required them to be 100 percent responsible for not only construction means and methods, but also the safety of all workers on the job. And the OSHA responsibility is exactly the same.

Further, Estrin testified that Mr. John, which had an oral contract with defendant, was not liable for plaintiff's injuries because its employees only had the responsibilities to service, clean and sanitize the portable toilets on "a weekly basis" and "to inform the construction superintendent on a job site if they discover anything that they feel is unsafe." Also, Mr. John was not responsible for the toilet's improper placement that resulted in a tripping hazard. Estrin emphasized:

> Pursuant to [Mr. John's] policy and their standards or procedures, very simply that if the individual who delivers the toilet is told to place it in a location in which that individual feels it is unsafe, he is to tell the superintendent on the job not to place it there or to move it.
>
> . . . .

13

If in fact he does not get a positive response from the superintendent, he's to call back to the office and talk to his superior, and his superior there would then go forward and try and work out a reasonable solution so everybody was happy.

Additionally, Estrin testified that BFC was not liable for plaintiff's injuries. He explained, citing OSHA's 29 C.F.R. § 1926.20(b)(2), that BFC was responsible for "provid[ing] a safe workplace free of recognized hazards, tripping hazard[s], which would cause injury to a worker," and for "mak[ing] regular and frequent inspections of the job site by a competent person to determine the predictable and existing hazards on the job site."[7]  However, there was no evidence that BFC or any of its employees had ever worked in the area where this particular portable toilet had been located before plaintiff's fall on April 1, 2015.

Estrin also testified that plaintiff:

> did not in any manner contribute to his accident because for example, under the OSHA regulations, he has a responsibility to comply with those regulations, if he was trained.  He was trained in the OSHA regulations, but it has to be an issue of unforeseeable worker misconduct.  There was no misconduct here.

---

[7]  29 C.F.R. § 1926.20(b)(2) states:  "Accident prevention responsibilities . . . Such programs shall provide for frequent and regular inspections of the job sites, materials, and equipment to be made by competent persons designated by the employers."

This man went to a temporary toilet because the temporary toilets which were safe for him to access and egress on the other side of the building where he was working were not available to him because the general contractor had sequenced a series of concrete pours and had not seen fit to move the portable or temporary toilets to another location, forcing [plaintiff] to go into the building, walk through the building, go down the stairs, and go to an area which he had never experienced before. And it had a tripping hazard. It had a dumpster, so he had to watch out for moving equipment, and to see that he wasn't run over or hit by falling objects. So that is not something that he would have to do.

He does not have a responsibility to investigate or inspect the [jobsite] . . . .

Based on those reasons, Estrin concluded that defendant was solely liable for plaintiff's accident and injuries.

During cross-examination, Estrin testified that plaintiff did not trip because of the dumpster opening out or blocking his view; plaintiff tripped only because of the curb. According to Estrin, plaintiff "opened the door and took his one step outward" and "his he[e]l caught that curb."

Nevertheless, Estrin agreed that Mr. John's employees had serviced the portable toilet four times before April 1; should have noticed it was in an unsafe placement; and should have advised Carman. Although Mr. John was responsible under OSHA for the safety of its own employees, there were no OSHA safety standards governing portable toilets or their placements,

15

recommended placements or servicing. Instead, 29 C.F.R. § 1926.51(d) only required that toilets shall be provided for employees, and then addressed the types and numbers of toilet facilities needed on a jobsite.

Defense counsel also cross-examined Estrin on OSHA's Multi-Employer Citation Policy (MECP), which provided "that any employer on a job site that has the ability to abate a hazard or prevent it, has the duty to do so." The MECP, according to Estrin, created four categories of employers at a multi-employer jobsite: (1) the controlling employer; (2) the creating employer; (3) the correcting employer; and (4) the exposing employer. Estrin clarified:

> There's the controlling employer. That is the individual who by function of either contract or agreement other than a written contract has overall responsibility for all work on the job site to include safety.
>
> There is the creating employer who is that employer who actually creates the volatile solution condition, like the tripping hazards, the unsafe condition or if it's a worker's involvement, an unsafe act.
>
> There is the correcting employer who is the employer who has been tasked with correcting the hazard, and on certain big jobs there are firms that are hired to construct the safety aspects of all of the work. It may be a carpentry firm putting up guardrails and that type of thing.

16

> And the final one is the exposing employer. That is the employer who actually sends his worker in harm's way, is the easy way to put it.

Although Estrin categorized BFC as plaintiff's "direct employer," and therefore "directly responsible" for plaintiff's health, safety and well-being, he opined that defendant was "solely liable" for plaintiff's accident and injuries. Estrin did not believe BFC was "expected to" determine where portable toilets were going to be used on the site and whether those were appropriately placed for its employees.

Estrin further explained that "the multi[-]employer [jobsite] policy by OSHA is unenforceable." The MECP was "not a standard and ha[d] no bearing, and cannot be enforced against anyone in the industry." He asserted that the MECP was rejected by the Occupational Safety and Health Review Commission (OSHRC) and the Circuit Courts of Appeals, because "the controlling employer . . . may have less than that of the exposing employer in terms of responsibility for worker safety." The OSHRC was "the administrative review commission of OSHA . . . It is a separate and independent body and has the force of law."

Nevertheless, when defense counsel confronted Estrin with language from one of the OSHA's general interpretation letters on the MECP, he agreed that it stated:

"A controlling employer," which in this case is [defendant], "must exercise reasonable care to prevent and detect violations on the site. The extent of the measures that a controlling employer must implement to satisfy this duty of reasonable care is less than what is required of an employer with respect to protecting its own employees. This means that the controlling employer is not normally required to inspect for hazards as frequently or to have the same level of knowledge of the applicable standards or trade expertise as the employer it has hired."

However, Estrin explained that an administrative interpretation letter, even one from OSHA, had "no bearing on any enforcement policy" and "no regulatory authority." It was not fact specific; for example, it did not discuss what would happen if the general contractor had signed a contract agreeing to be solely responsible for safety on the project.

Lastly, Estrin acknowledged that there were other construction standards that governed portable bathrooms on construction sites, such as the American National Standards Institute's (ANSI)[8] standards, trade or professional

---

[8]  According to its website, ANSI "is a private, non-profit organization that administers and coordinates the United States voluntary standards and conformity assessment system. Founded in 1918, the Institute works in close collaboration with stakeholders from industry and government to identify and develop standards- and conformance-based solutions to national and global priorities." About ANSI, ANSI, https://www.ansi.org/about/introduction (last visited June 9, 2021).

A-1760-19

association standards like the Portable Sanitary Association International and the American Association of General Contractors, and that there were construction standards promulgated by local municipalities. However, none of those other standards, like OSHA, provided any guidance on portable toilet placement according to Estrin because placement was "up to the general contractor and [it] has the ability to make that decision based upon the actual conditions that exist on the site at the time [it] places the toilet. . . ." Moreover, Estrin posited that portable toilet placement was based on teaching and experience.

Chana Goldsmith, plaintiffs' expert in nursing and lifetime care planning, testified that plaintiff's future care would cost $462,339. Plaintiffs' vocational expert, Sonya Mocarski, opined that plaintiff suffered "[a] complete and total loss of earning capacity." Andrew Verzilli, plaintiffs' economic expert, testified that plaintiff's lost wages and future financial losses was approximately $1,936,000.

Steven L. Bisbee testified as the defense expert. He is OSHA certified and has over thirty years' experience in the portable toilet rental industry. Bisbee testified that Mr. John would have completely relied on "[t]he customer" or defendant's construction site contact for directions on portable toilet placement.

He explained that if the site contact instructed the driver to place a portable toilet in a hazardous position, the driver would encourage the contact to relocate the toilet. If it was not moved, the driver was trained to submit a formal "relocate ticket" to Bisbee and to the customer or general contractor.

After reviewing the accident site photos, Bisbee opined that there was nothing wrong or unsafe with placement of the portable toilet. Portable toilets were usually placed "near a dumpster or a construction trailer, up against a building, to put them out of the way." He and his drivers had placed "thousands" in those "normal" areas.

On cross-examination, Bisbee admitted that he was concerned only with two things: whether a portable toilet was placed within the length of a hose so that his workers could clean the unit; and whether the unit was placed on a level surface so users could walk out onto level ground and avoid tripping.

Michael Cronin, who investigated and conducted accident reconstruction investigations, including "curb cases" when individuals tripped either ascending or descending a curb, testified as an expert in civil engineering on behalf of the defense. He completed a thirty-hour OSHA construction safety course; was familiar with OSHA and ANSI standards; and with state building and construction codes. He also had reviewed OSHA's general duty clause and

multi-employer jobsite policy for general contractors and subcontractors working on the same site.

Cronin found no OSHA regulation or standard governing the placement of portable toilets on construction sites or near curbs. He noted Estrin also never found that defendant had violated any OSHA regulation or standard. Cronin stated:

> Just because [defendant is] responsible for the job site, they're not citeable [sic] unless there's a violation of an OSHA standard. And Estrin's report never established any violation of any OSHA standard, so therefore [defendant] nor anyone else on the job site is citeable [sic] under OSHA, because there's simply no violation of any OSHA standard.

Additionally, based on his review of the accident site photos, witness depositions and expert reports, Cronin opined that the location of the portable toilet at issue did "not violate any standard, code, ordinance, industry practice." He noted that a curb greater in height than a half inch from ground level was a "tripping hazard" and, based on the photos, "there's just no evidence that there's any tripping hazard on this job site." On cross-examination, Cronin agreed that the photos showed the curb height was more than half an inch to the parking lot and to the dirt of the planting bed.

21

Nevertheless, Cronin opined that it was a "normal industry standard" that workers on a construction site have no "expectation for a perfectly flat surface," especially when the area "was a natural ground surface." Cronin pointed out plaintiff testified "that as he exited the—the portable toilet, he—he looked down and he observed the curb condition prior to tripping." Thus, Cronin testified, "if [plaintiff] observed it, he should have taken reasonable steps and—and descended the curb in a safe manner, and—and in a similar manner to the way he ascended the curb just a few minutes before that."

In addition, although Cronin had not examined defendant's prime construction contract, he agreed that its terms—defendant "[s]hall supervise and direct the work" and "'[t]he contractor shall be solely responsible' . . . for providing a safe [jobsite]"—meant defendant was 100 [percent] "responsible for providing a safe [jobsite]" for all workers. He acknowledged that his own duties had included ensuring that all construction work was performed in accordance with contract documents and that Carman was defendant's supervisor and the person "in charge of the project."

Following the testimony, counsel and the trial court held a charge conference and then discussed the jury charge on the record. In their pretrial proposed jury instructions, plaintiffs requested the trial court charge the jury

22

with Model Jury Charges (Civil) 5.10G, "Standards of Construction, Custom and Usage in Industry or Trade" (approved Mar. 2010) (formerly Model Jury Charge 5.10H) (Model Charge 5.10G).[9] During the charge conference, plaintiffs also presented supplemental instructions, asking the trial court to instruct the jury that OSHA regulations constitute evidence establishing the duty of care required for negligence, and the jury should consider violations of those regulations as evidence of negligence.

Defendant's pretrial proposed jury instructions also requested the court charge the jury with Model Charge 5.10G. However, during the charge conference, defendant's counsel stated he did not want any OSHA charge given, and instead, he asked the trial court to advise the jury that "a general contractor is required to provide a reasonably safe place to work, but is not required to eliminate all potential hazards."

_____

[9] Rule 1:8-7(a) provides in civil cases:

> [A]s to issues not anticipated prior to trial any party may submit written requests that the court instruct the jury on the law as set forth in the requests. The requests shall make specific reference to the Model Civil Jury Charges, if applicable . . . . The court shall, on the record, rule on the requests prior to closing arguments to the jury.

The trial court noted that defendant's suggested language was "not in the Model Charge," and then denied both parties' requests "to be consistent with both sides." The court continued:

> This is . . . a case of generic negligence against a general contractor for placing what's an easily understandable tripping hazard.
>
> . . . .
>
> This jury's going to have to decide based upon their own visceral sense of fairness whether or not the general contractor should have allowed this curb to be so close from the front door of the porta[-]potty.

The trial court stated that it would instruct the jury on business invitees since the parties wanted that charge, in addition to general negligence, foreseeability, and defendant's duty to make the site reasonably safe. Nonetheless, the court stated it would include Model Charge 5.10G if the parties agreed to each other's language for the charge. Defendant's counsel did not agree. On the other hand, plaintiffs' counsel objected to the trial court's refusal to include language about OSHA violations. The court emphasized:

> The Supreme Court says the burden is on the plaintiff that it must prove some OSHA violation to get to the jury on a negligence cause of action against a contractor.

A-1760-19

You're transforming that into an obligation of the judge to include in the charge language concerning an OSHA violation over the defendant's objection.

. . . .

Think about it this way. In many . . . cases courts don't include into the charge every single item of evidence educed by all sides in the case and comment specifically on that in the jury charge. . . .

. . . .

What you're citing to is a piece of evidence in this case. There is -- by the way, note that this case is actually pretty weak for the argument. The reason why it's weak is that there was nothing explicitly in OSHA in regards to the placement of a porta[-]potty. There's general language which is obvious. Everything's got to be placed in a safe condition. So, this is actually a poor case to argue that the Court should tailor a specific OSHA charge on a workplace accident.

Your argument would be stronger if OSHA said, just for example, there shall be no obstacles within [twenty-four] inches of the front door of a porta[-]potty. Then you could make -- you could make an argument analogous to what we do in auto negligence cases when a defendant pleads guilty to some type of traffic offense, that type of stuff. But suppose OSHA found -- it would be even more analogous if OSHA investigated, and found, and cited an OSHA violation under these circumstances. Then it really is analogous to the Model Charge.

. . . .

25

Secondly, again, the OSHA violations here are more generic. They weren't specific.

Ultimately, the trial court did not include Model Charge 5.10G or make any reference to the OSHA standards or regulations in its final charge. During deliberations, the jury asked five questions related to damages; none were related to liability, negligence, or OSHA issues.

The jury found: (1) defendant was 100 percent negligent; (2) Mr. John was not negligent; (3) plaintiff was not comparatively negligent; (3) plaintiff incurred past medical expenses of $101,980.79, and past lost earnings of $220,000; (4) plaintiff will incur future medical expenses of $111,720, and has a future lost earning capacity of $660,000; (5) plaintiff suffered and will suffer past, present, and future pain and suffering, embarrassment, humiliation, disfigurement, and loss of enjoyment of life, totaling $625,000; and (6) plaintiff's wife incurred per quod damages of $625,000.

Following the jury's verdict, defendant's counsel moved for a new trial, arguing the trial court erred by not striking or limiting Estrin's testimony because it was a net opinion, and because he testified about contracts and safety language that were beyond his expertise. Defendant further contended that Estrin never cited to any specific OSHA regulation, standard, or duty that defendant violated even though he opined defendant was one hundred percent liable for plaintiff's

fall. Defense counsel further argued that, after refusing to strike or limit Estrin's testimony, the trial court erred by not instructing the jury on OSHA violations or telling them that a violation of OSHA "doesn't necessarily mean anything."[10]

In denying defendant's motion, the trial court initially noted that defendant had argued expressly against mentioning OSHA in the liability charge. The court next discussed the scope of Estrin's testimony:

> So, you may be right, that I was a bit overindulgent in regard to allowing the expert to testify about what the contract said between your client and their obligations to provide a safe work site.
>
> But, the jury is perfectly capable, independent of that, of determining whether or not the placement of this porta[-]potty was done in a negligent manner, without regard to whether the expert said that that implicated the contractual provision to provide a safe workplace, et cetera, et cetera.

The court highlighted:

> As I indicated, the case was very -- was very well tried. I thought from the beginning that actually the plaintiff had the better case on liability for a very simple reason. It had nothing to do with OSHA violations, or experts, or anything like that. Merely looking at a picture of the port-o-potty, and seeing where -- and it was a tripping hazard. This was a piece of wood or something sticking out, I don't know, about

---

[10] Defense counsel also argued that the jury's allocating 100 percent liability to defendant was against the weight of the evidence.

[six] inches, [eight] inches, whatever it was. It was a tripping hazard. People can trip on it.

[Plaintiff] should have been looking where he was going. And as I indicated a few minutes ago, had this been a bench trial, I probably would have found [fifteen], [twenty], [twenty-five] percentage points of comparative negligence.

But I certainly, for what it's worth, I agree with the jury's determination that [defendant], which was the general contractor, and had overall responsibility for the safety of the workers. And the port-o-potty could have [been] turned around 180 degrees so that there was no tripping hazard.

On December 6, 2019, the trial court entered an order denying defendant's motion for a new trial and entered a memorializing order. This appeal followed.

On appeal, defendant raises two points: (1) the trial court's failure to instruct the jury on the significance of OSHA regulations led to an unjust result; and (2) the jury's apportionment of one hundred percent of the liability for plaintiff's accident to defendant was against the weight of the evidence and warrants a new trial.

II.

"It is fundamental that '[a]ppropriate and proper charges to a jury are essential for a fair trial.'" Prioleau v. Ky. Fried Chicken, Inc., 223 N.J. 245, 256 (2015) (alteration in original) (quoting Velazquez ex rel. Velazquez v. Portadin,

28

163 N.J. 677, 688 (2000)).  The jury charge is "a road map that explains the applicable legal principles, outlines the jury's function, and spells out 'how the jury should apply the legal principles charged to the facts of the case at hand.'" Toto v. Ensuar, 196 N.J. 134, 144 (2008) (quoting Viscik v. Fowler Equip. Co., 173 N.J. 1, 18 (2002)).  It therefore "should set forth in clear understandable language the law that applies to the issues in the case."  Ibid.  In a civil case, we "uphold even erroneous jury instructions when those instructions are incapable of producing an unjust result or prejudicing substantial rights."  Fisch v. Bellshot, 135 N.J. 374, 392 (1994).  Cf. Walker v. Costco Wholesale Warehouse, 445 N.J. Super. 111, 120 (App. Div. 2016) (stating failure to give jury charge on mode-of-operation was "clearly capable of affecting the verdict on liability").

Defendant argues that the trial court's failure to instruct the jury on the significance of the OSHA regulations as set forth in Model Jury Charge 5.10G, led to an unjust result.  That charge states:

> Some evidence has been produced in this case as to the standard of construction in the industry.  Such evidence may be considered by you in determining whether the defendant's negligence has been established.  If you find that the defendant did not comply with that standard, you may find the defendant to have been negligent.  However, the general custom of the industry, although evidential as to what is the reasonable standard in such industry, does not conclusively establish the care the defendant was

required to exercise in the performance of its operations. Compliance with an industry standard is not necessarily conclusive as to the issue of negligence, and does not, of itself, absolve the defendant from liability. The defendant must still exercise reasonable care under all the circumstances, and if you find that the prevailing practices in the industry do not comply with that standard, the defendant may be found negligent by you notwithstanding compliance with the custom or standard of the industry.

[Model Charge 5.10G.]

And in a footnote, the charge declares:

Where it is alleged that a contractor violated [OSHA] regulations, such violation is treated similarly to a violation of an industry standard. See Costa v. Gaccione, 408 N.J. Super. 362, 372 (App. Div. 2009) (citing Alloway v. Bradlees, Inc., 157 N.J. 221, 236 (1999) ("violation of OSHA regulations without more does not constitute the basis for an independent or direct tort remedy.")[).] Thus, as with industry standards, OSHA regulations are pertinent in determining the nature and extent of any duty of care, but compliance with OSHA does not preclude a finding of negligence and, conversely, non-compliance with OSHA does not preclude a finding that there was no negligence. Id. at 237.

[Model Charge 5.10G n.2.]

Plaintiffs respond that defendant invited the error when it expressly advocated against the court charging the jury with Model Charge 5.10G on the OSHA regulations and then failed to object to the absence of that instruction.

They claim the trial court correctly charged the jury on the general principles of negligence.

In reply, defendant asserts the court had an independent duty to charge the jury with Model Charge 5.10G, or in the alternative, defendant claims that, even if it had invited or acquiesced in an erroneous jury charge, we are required to reverse because the charge was clearly capable of producing an unjust result under the plain error standard. We disagree.

"[G]eneral negligence principles govern the determination of whether a legal duty should be imposed on a contractor for injuries sustained by another contractor's employee." Slack v. Whalen, 327 N.J. Super. 186, 191 (App. Div. 2000) (citing Alloway, 157 N.J. at 230). To prevail in a negligence case, a plaintiff must demonstrate that (1) the defendant owed the plaintiff a duty of care; (2) the defendant breached that duty; (3) the defendant's breach of its duty actually and proximately caused the plaintiff's injury; and (4) the plaintiff sustained damages. Fernandes v. DAR Dev. Corp., 222 N.J. 390, 403-04 (2015). Whether a defendant owes a plaintiff a duty and the scope of that duty are legal questions. Shields v. Ramslee Motors, 240 N.J. 479, 487-88 (2020).

Determining whether a duty exists "involves identifying, weighing, and balancing several factors—the relationship of the parties, the nature of the

attendant risk, the opportunity and ability to exercise care, and the public interest in the proposed solution." Hopkins v. Fox & Lazo Realtors, 132 N.J. 426, 439 (1993). The foreseeability of an injury "is 'crucial' in determining whether a duty should be imposed." J.S. v. R.T.H., 155 N.J. 330, 338 (1998) (quoting Carter Lincoln-Mercury, Inc. v. EMAR Grp., Inc., 135 N.J. 182, 194 (1994)).

"Foreseeability requires a determination of whether the defendant was reasonably able to ascertain that his allegedly negligent conduct could injure the plaintiff in the manner it ultimately did." Robinson v. Vivirito, 217 N.J. 199, 212 (2014). Foreseeability "is the major consideration for imposing a tort duty, [but] additional factors should [also] be considered, such as 'the relationship of the parties, the nature of the attendant risk, the opportunity and ability to exercise care and the public interest . . . .'" Slack, 327 N.J. Super. at 191 (quoting Alloway, 157 N.J. at 230).

An OSHA violation may be considered with those factors in determining the existence and scope of duty but does not alone create a "tort duty of care." Costa v. Gaccione, 408 N.J. Super. 362, 372-73 (App. Div. 2009); see also Tarabokia v. Structure Tone, 429 N.J. Super. 103, 120 (App. Div. 2012). "Whether a [d]uty exists is ultimately a question of fairness." Goldberg v. Hous.

Auth. of Newark, 38 N.J. 578, 583 (1962). See also Olivo v. Owens-Illinois, Inc., 186 N.J. 394, 401 (2006).

Here, as plaintiffs correctly claim, defendant expressly argued during the charge conference against the trial court's instructing the jury with Model Charge 5.10G and, in fact, against even its mentioning OSHA. "The doctrine of invited error operates to bar a disappointed litigant from arguing on appeal that an adverse decision below was the product of error, when that party urged the lower court to adopt the proposition now alleged to be error." N.J. Div. of Youth & Fam. Servs. v. M.C. III, 201 N.J. 328, 340 (2010) (quoting Brett v. Great Am. Recreation, Inc., 144 N.J. 479, 503 (1996)).

> "[A] defendant cannot beseech and request the trial court to take a certain course of action, and upon adoption by the court, take his[, hers or its] chance on the outcome of the trial, and if unfavorable, then condemn the very procedure he[, she or it] sought . . . claiming it to be error and prejudicial."
>
> [Ibid. (quoting State v. Jenkins, 178 N.J. 347, 358 (2004) (citation omitted)). See Titus v. Lindberg, 49 N.J. 66, 78 (1967) (finding Board of Education was barred from asserting error in jury charge it requested).]

Nevertheless, a court "would not automatically apply the doctrine [of invited error] if it were to 'cause a fundamental miscarriage of justice.'" M.C. III, 201 N.J. at 342 (quoting Brett, 144 N.J. at 508).

A-1760-19

Here, we discern no fundamental injustice that would warrant relaxing the invited error doctrine since defendant's counsel ostensibly made a strategic decision when he changed his plan and decided to advocate against the trial court's charging the jury on OSHA evidence or with Model Charge 5.10G. Nevertheless, defendant correctly asserts, "the ultimate responsibility rests with the [trial] court to instruct the jury regarding the appropriate law that is applicable to the evidence." Das v. Thani, 171 N.J. 518, 530 (2002). Consequently, we will evaluate an invited error under "the plain error standard." Willner v. Vertical Reality, Inc., 235 N.J. 65, 79 (2018) (quoting State v. Wakefield, 190 N.J. 397, 473 (2007)).

Rule 2:10-2 defines "plain error" as error that is "clearly capable of producing an unjust result." It states:

> Any error or omission shall be disregarded by the appellate court unless it is of such a nature as to have been clearly capable of producing an unjust result, but the appellate court may, in the interests of justice, notice plain error not brought to the attention of the trial or appellate court.
>
> [R. 2:10-2.]

With regard to a jury charge, "plain error is 'legal impropriety in the charge prejudicially affecting the substantial rights of the [party] and sufficiently grievous to justify notice by the reviewing court and to convince the

34

court that of itself the error possessed a clear capacity to bring about an unjust result.'" Mason v. Sportsman's Pub, 305 N.J. Super. 482, 495 (App. Div. 1997) (quoting State v. Hock, 54 N.J. 526, 538 (1969)).

In the matter under review, the initial disputes for the jury to resolve were the nature of the care defendant was required to provide for subcontractors on its jobsite and then whether it violated its duty of care.[11] There was extensive testimony on OSHA standards and regulations. "OSHA regulations are pertinent in determining the nature and extent of any duty of care." Alloway, 157 N.J. at 236. See Kane v. Hartz Mountain Indus., Inc., 278 N.J. Super. 129, 144 (App. Div. 1994) (finding "error in the trial judge's failure to provide adequate guidance to the jury regarding the proper interpretation of the OSHA regulations"), aff'd o.b., 143 N.J. 141 (1996).

The purpose of OSHA, 29 U.S.C. §§ 651 to 678, is "to provide for the general welfare, to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources . . . ." 29 U.S.C. § 651(b). It requires "employers to comply with specific OSHA standards and also imposes a general duty on employers to

---

[11] We note the nature of the duty is different from the question of whether one owes a duty in the first place, which is a question of law to be decided by the trial judge. Carvalho v. Toll Bros. & Devs., 143 N.J. 565, 572 (1996).

provide a workplace 'free from recognized hazards that are causing or are likely to cause death or serious physical harm.'" Gonzalez v. Ideal Tile Importing Co., 371 N.J. Super. 349, 359-60 (App. Div. 2004) (quoting 29 U.S.C. § 654(a)).

Based upon our careful review of the record, we conclude that, the omission of Model Charge 5.10G and OSHA from the trial court's instructions was not clearly capable of producing an unjust result here. Estrin did not point to any specific OSHA regulation governing the toilet's placement, and Cronin agreed that there had been no violation of any OSHA standard. In fact, no violation of any specific OSHA provision on portable toilets was ever presented to the jury. Instead, the evidence referred to general OSHA standards and regulations offering the same level of care as the general theory of negligence.

We "must read the charge as a whole." Sons of Thunder, Inc. v. Borden, Inc., 148 N.J. 396, 418 (1997); see also Estate of Kotsovska ex rel. Kotsovska v. Liebman, 221 N.J. 568, 592 (2015) (stating that a court presented with a contested jury charge must evaluate the entirety of the charge and not focus on individual, isolated errors). "[T]he prejudicial effect of an omitted instruction must be evaluated in light of the totality of the circumstances including all of the instructions to the jury, [and] the arguments of counsel." State v. Townsend, 186 N.J. 473, 499 (2006) (second alteration in original) (quoting State v.

<u>Marshall</u>, 123 N.J. 1, 145 (1991)); <u>see also</u> <u>Piech v. Layendecker</u>, 456 N.J. Super. 367, 377 (App. Div. 2018) ("We must consider . . . whether counsel voiced any contemporaneous objection, . . . and the likelihood that the flaw was so serious that it was likely to have produced an unfair outcome.").

Although defendant's argument is subject to the invited error doctrine, in the interests of justice, we review the jury instructions for plain error. Here, we are satisfied that the trial court clearly explained the elements of negligence and plaintiffs' obligation to prove negligence by a preponderance of the credible evidence.

Moreover, a violation of the OSHA standards and regulations is not dispositive of a general contractor's liability. <u>Alloway</u>, 157 N.J. at 234. "Compliance with an OSHA regulation does not in and of itself preclude a finding of negligence," and, for the same reason, the violation of an OSHA regulation "does not ipso facto constitute a basis for assigning negligence as a matter of law." <u>Kane</u>, 278 N.J. Super. at 142, 144. Thus, while the existence of an OSHA violation may be some evidence that defendant did not follow the regulations, it is not conclusive evidence that defendant was liable as a general contractor or property occupier.

More importantly, there was substantial, credible evidence presented that Carman's duty was to supervise the entire jobsite, including toilet placement, and defendant's duties were specifically enumerated in its prime construction contract, which made defendant "solely responsible for, and ha[ving] control over, construction means, methods, techniques, sequences and procedures and for coordinating all portions of the Work under the Contract." Cronin, defendant's expert, even agreed with Estrin that Carman was in charge of the project, as confirmed in defendant's answers to interrogatories certified by its president, and the terms in the prime construction contract meant defendant had an absolute duty and was one hundred percent responsible for providing a safe jobsite for all workers.

In light of this compelling evidence, the jury had a strong, independent basis on which to find defendant's negligence. The jury clearly rejected the testimony presented by the defense witnesses, and instead found more credible plaintiffs and their witnesses. Therefore, we conclude the absence of any charge on OSHA standards and regulations, including Model Charge 5.10G, was irrelevant to the jury's liability verdict and its findings on the care defendant was required to provide for subcontractors and employees on its jobsite, relative to defendant's violation of that care. Applying these standards, we conclude the

trial court's decision not to charge the jury on OSHA standards and regulations, as in Model Charge 5.10G, was not "clearly capable of producing an unjust result" constituting plain error under Rule 2:10-2 and does not warrant reversal.

III.

Defendant next argues that the trial court erred by failing to strike or limit the scope of Estrin's testimony, and the court's alleged improper comment further underscored the need to charge the jury about OSHA standards and regulations. According to defendant, the trial court's failure to give a proper jury instruction on OSHA regulations led to an unjust result.[12]

In April 2019, defendant moved to bar Estrin's report and testimony as a net opinion, arguing that he had cited no specific OSHA standard for the placement of portable toilets and had failed to include any measurements of the scene. During oral argument, the trial court asked defendant's counsel why he believed OSHA regulations were not applicable:

---

[12] Defendant also claims in various footnotes throughout its brief and reply brief that many points in Estrin's testimony were "legally incorrect" or "patently false." These allegations of error are waived because defendant raised them in footnotes and not under point headings. Almog v. Isr. Travel Advisory Serv., Inc., 298 N.J. Super. 145, 155 (App. Div. 1997) (holding legal issues raised in footnotes and not under appropriate point headings required by Rule 2:6-2(a)(5) will not be considered on appeal).

THE COURT: . . . but what's your complaint about the plaintiff's expert . . . citing the OSHA standards even if only as to -- as to the general proposition, as opposed to whether or not there should be a curb three feet from the front door of a porta[-]potty?

[DEFENDANT'S COUNSEL]: Well, because now it looks like we violated two different standards. If you just say, well, he's just going to come in and blather on about negligence or failure to comply with OSHA, that doesn't matter, because what matters is the standard due to an invitee on the premises. Which plaintiff is. He's an invitee on the premises. That's the standard. Not the OSHA standard. So, to the extent that you allow an expert to come in and say, oh, OSHA requires him to do this and OSHA requires him to do that, and then you come along later and go, oh yeah, OSHA requires him to do this and OSHA requires him to do that; oh, and by the way, the law -- the -- you know, the general law is that a business owner owes this duty to an invitee, so now the defense has a -- has the burden of fighting two different fronts and two different theories of liability. There shouldn't be two different theories of liability. There should be one theory of liability which can be supported by alleged OSHA violations, but the OSHA violations in and of themselves do not establish the standard.

. . . .

THE COURT: . . . [T]hat would be an issue that will be taken up at the charge conference, in terms, of exactly what the charge is. But I don't see there being any problem with an expert -- in fact, they do it all the time -- citing to various standards -- OSHA is one of the more predominant ones -- in regard to the basis of their opinion. . . .

40

Thereafter, the trial court denied the motion, with the proviso that defendant could renew the objection at trial. However, the record shows that during Estrin's testimony, defense counsel raised no specific objections to the expert's comments about the scope of OSHA standards and regulations, defendant's prime construction contract, or OSHA's MECP.

After Estrin testified, defendant renewed its motion to strike his testimony, arguing that the applicable standard of liability was general negligence, because the matter involved a contractor or occupier of property. Defense counsel contended that Estrin's testimony on OSHA's general safety standards confused the jury, thereby allowing the jury to find defendant potentially culpable under two different liability standards: general negligence and OSHA.

The trial court again denied the motion and explained:

> To me I don't see it as a basis for disqualifying Estrin. He essentially used these standards as a basis for arguing that there was negligence in maintaining this particular area due to the presence of the curb.
>
> The more difficult question is whether or not the charge should include explicit to [sic] OSHA violations particularly in this case where there's nothing narrowly tailored to an OSHA violation.
>
> . . . .

41

> So we'll deal with that at the charge conference, but I'm denying the motion to strike the entirety of Estrin's testimony.

A trial court's evidentiary rulings, including those regarding expert testimony, are "entitled to deference absent a showing of an abuse of discretion." State v. Brown, 170 N.J. 138, 147 (2001) (quoting State v. Marrero, 148 N.J. 469, 484 (1997)); see also Townsend v. Pierre, 221 N.J. 36, 53 (2015); Bender v. Adelson, 184 N.J. 411, 428 (2006). "[An] abuse of discretion only arises on demonstration of 'manifest error or injustice,'" Hisenaj v. Kuehner, 194 N.J. 6, 20 (2008) (quoting State v. Torres, 183 N.J. 554, 572 (2005)), and occurs when the trial judge's "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" Milne v. Goldenberg, 428 N.J. Super. 184, 197 (App. Div. 2012) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)). We discern no abuse of discretion here.

Generally, the admission of expert testimony is governed by Rule 702, which provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or

education may testify thereto in the form of an opinion or otherwise.

Admissibility turns on three basic requirements:

> (1) the intended testimony must concern a subject matter that is beyond the ken of the average juror; (2) the field testified to must be at a state of the art such that an expert's testimony could be sufficiently reliable; and (3) the witness must have sufficient expertise to offer the intended testimony.
>
> [Agha v. Feiner, 198 N.J. 50, 62 (2009) (quoting State v. Kelly, 97 N.J. 178, 208 (1984)).]

Rule 703 addresses the foundation for expert testimony. The rule mandates that expert opinion be grounded in "facts or data derived from (1) the expert's personal observations, or (2) evidence admitted at the trial, or (3) data relied upon by the expert which is not necessarily relied upon by experts in forming opinions on the same subject." Polzo v. Cnty. of Essex, 196 N.J. 569, 583 (2008) (quoting Townsend, 186 N.J. at 494).

The net opinion rule is a "corollary of [Rule 703] . . . which forbids the admission into evidence of an expert's conclusions that are not supported by factual evidence or other dat[a]." Ibid. (alteration in original). The rule requires that an expert "'give the why and wherefore' that supports the opinion, 'rather than a mere conclusion.'" Borough of Saddle River v. 66. E. Allendale, LLC, 216 N.J. 115, 144 (2013) (quoting Pomerantz Paper Corp. v. New Cmty. Corp.,

43

207 N.J. 344, 372 (2011)); see also Buckelew v. Grossbard, 87 N.J. 512, 524 (1981) (explaining that "an expert's bare conclusion[], unsupported by factual evidence, is inadmissible").

The net opinion rule does not mandate an expert organize or support an opinion in a particular manner that opposing counsel deems preferable. Pierre, 221 N.J. at 54. An expert's proposed testimony should not be excluded merely "because it fails to account for some particular condition or fact which the adversary considers relevant." Creanga v. Jardal, 185 N.J. 345, 360 (2005) (quoting State v. Freeman, 223 N.J. Super. 92, 116 (App. Div. 1988)).

The net opinion rule, however, mandates that experts "be able to identify the factual bases for their conclusions, explain their methodology, and demonstrate that both the factual bases and the methodology are scientifically reliable." Landrigan v. Celotex Corp., 127 N.J. 404, 417 (1992). An expert's conclusion "is excluded if it is based merely on unfounded speculation and unquantified possibilities." Grzanka v. Pfeifer, 301 N.J. Super. 563, 580 (App. Div. 1997) (quoting Vuocolo v. Diamond Shamrock Chem. Co., 240 N.J. Super. 289, 300 (App. Div. 1990)). By definition, unsubstantiated expert testimony cannot provide to the factfinder the benefit that Rule 702 envisions: a qualified specialist's reliable analysis of an issue "beyond the ken of the average juror."

Polzo, 196 N.J. at 582; see N.J.R.E. 702. Given the weight that a jury may accord to expert testimony, a trial court must ensure than an expert is not permitted to express speculative opinions or personal views that are unfounded in the record. Pierre, 221 N.J. at 55.

Applying these standards, we conclude the trial court did not abuse its discretion by refusing to strike or limit Estrin's testimony. The entirety of Estrin's opinions and his testimony were contained in his pretrial expert report. Nonetheless, defendant asserts that the following statements by Estrin "were legally incorrect, improper, and had a clear impact on the jury" and "exceeded the permissible scope of expert testimony": (1) characterizing the OSHRC as having the force of law; (2) calling the MECP unenforceable and suggesting that courts had rejected the argument that a controlling employer or general contractor has less responsibility to protect workers than an exposing employer; (3) declaring that the OSHA regulations rendered defendant 100 percent responsible for plaintiff's accident; and (4) stating that plaintiff was not responsible for his fall unless he had engaged in misconduct.

We reject defendant's arguments. The record reveals that defense counsel never objected to Estrin's statements. In any event, defense counsel extensively cross-examined Estrin. And in fact, Estrin made the first two challenged

statements during his cross-examination. Therefore, we discern no error or abuse of discretion by the trial court in denying defendant's motion to strike or limit the scope of Estrin's testimony.

IV.

Finally, defendant contends the trial court erred by not granting its motion for a new trial as the jury's finding defendant 100 percent liable for plaintiff's fall and injuries was against the weight of the evidence.[13] We disagree.

A trial judge shall not reverse a jury verdict as against the weight of the evidence unless, "having given due regard to the opportunity of the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that there was a miscarriage of justice under the law." R. 4:49-1(a).

> A "miscarriage of justice" has been described as a "pervading sense of 'wrongness' needed to justify [an] appellate or trial judge undoing of a jury verdict . . . [which] can arise . . . from manifest lack of inherently credible evidence to support the finding, obvious overlooking or undervaluation of crucial evidence, [or] a clearly unjust result. . . ."
>
> [Risko v. Thompson Muller Auto. Grp., 206 N.J. 506, 521-22 (2011) (alterations in original) (quoting

---

[13] In its new trial motion, defendant also argued the trial court erred by not striking Estrin's testimony and by not instructing the jury on OSHA regulations. However, on appeal, defendant only challenges the jury's liability apportionment as against the weight of the evidence.

> Lindenmuth v. Holden, 296 N.J. Super. 42, 48 (App. Div. 1996)).]

We look to the same standard as the trial court when reviewing the denial of a motion for new trial. R. 2:10-1; Pellicer ex rel. Pellicer v. St. Barnabas Hosp., 200 N.J. 22, 52 (2009). That is, as an appellate court, we must make our own determination and shall not reverse a jury verdict as against the weight of the evidence "unless it clearly appears that there was a miscarriage of justice under the law." R. 2:10-1. The only exception from the trial court's review is that we must defer to the trial judge's views on "witness credibility," "demeanor," "feel of the case," and other intangible aspects that are not transmitted by the written record. Dolson v. Anastasia, 55 N.J. 2, 6 (1969). The trial judge's decision, however, is not entitled to any special deference when "it rests upon a determination as to worth, plausibility, consistency or other tangible considerations apparent from the face of the record." Id. at 7.

After the jury's verdict, defendant's counsel moved for a new trial, arguing the jury's findings that defendant was 100 percent liable and that Mr. John was not liable were against the weight of the evidence.

As to the jury's liability percentages, the trial court noted:

> I agree with you; I was surprised that they didn't find
> any comparative. It's fairly common for a jury in these

47

scenarios to find some comparative on the part of the plaintiff.

And because plaintiff's expert did blame the porta[-]potty company -- of course, the plaintiff settled with the porta[-]potty company, so the shift -- then the shift always occurs. And I don't say that pejoratively, that's the way litigation is played. So I was, I would say, a bit surprised it was a hundred zero.

But the standard is very -- obviously I'm not here to second-guess the jury. It was -- it was certainly within reason for the jury to determine that the porta[-]potty company was not responsible for making sure that there wouldn't be a tripping hazard, [eighteen] feet -- [eighteen] inches, or whatever it was, from the front door of the porta[-]potty.

As far as comparative goes, yeah, the plaintiff should have been looking where he was walking, and had it been a bench trial, I certainly would have attributed some percentages of comparative on the plaintiff. But the jury's refusal to do so was within the range of reasonability. That's basically where you end up.

I agree with you on the merits. In terms of the -- those percentages, but it wasn't my call, it was the jury's call.

The trial court stated that it "thought from the beginning that actually the plaintiff had the better case on liability for a very simple reason. It had nothing to do with OSHA violations, or experts, or anything like that." By merely looking at the photos, the jury could see "it was a tripping hazard," so the court

A-1760-19

"certainly . . . agree[d] with the jury's determination that [defendant], which was the general contractor, . . . had overall responsibility for the safety of the workers. And the port-o-potty could have [been] turned around 180 [sic] degrees so that there was no tripping hazard."

Defendant specifically argues that the jury's apportionment of fault was "directly contrary" to Estrin's testimony and the undisputed evidence. That is, Estrin testified that Mr. John was negligent both in the placement of the portable toilet and in subsequent visits to the site when its representatives or employees did not advise Carman of a potentially hazardous condition. Moreover, it was uncontroverted that plaintiff had a clear view of the curb area in front of the portable toilet and was able to safely navigate over the curb when entering the toilet. Defendant's arguments are devoid of merit.

We note the record adequately supports the jury's verdict. See R. 2:10-1. Estrin testified that Mr. John's employees had weekly responsibilities only to clean the toilets and to inform Carman, defendant's onsite supervisor, if they discovered anything unsafe. The toilet already had been in place four weeks prior to plaintiff's fall, so the jury could have determined that Carman had plenty of time to notice and correct its hazardous placement. According to defendant's president, Carman was defendant's supervisor and the person responsible for the

whole jobsite, including directing placement of the portable toilets. Also, Estrin and defendant's expert, Cronin, agreed that the terms of defendant's prime contract rendered it 100 percent and solely liable for providing a safe jobsite for all workers.

Additionally, Estrin testified that plaintiff had no responsibility to investigate or inspect the placement of a portable toilet, especially in an area that he had never visited before the day of his fall. Indeed, there was no evidence presented that BFC or any of its employees had ever worked in the area where the toilet was located before plaintiff's fall.

Furthermore, the jury could have considered that plaintiff was not contributorily negligent due to defendant's sole responsibility for placement of the dumpster and the wood step in the parking lot near the toilet. As Estrin testified, because of the dumpster, plaintiff had to be on the lookout for moving construction vehicles and equipment near the toilet. And, the jury evaluated and credited plaintiff's testimony that, when he exited the toilet, plaintiff was cognizant of the front-end loader he observed in the parking lot before entering the portable toilet.

As we discern no clear miscarriage of justice under the law, we affirm the jury verdict and the denial of defendant's motion for a new trial.

A-1760-19

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

51